**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GEORGE NUNOO | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  21-2169 |
| | : | |
| KATHLEEN BAUSMAN, *et al.* | : | |

# MEMORANDUM
## with Findings of Fact & Conclusions of Law

**KEARNEY, J.**                                                                            **February 22, 2022**

Ghana native George Nunoo met citizen Dawn Nunoo in 1999 when he toured New York with other Ghana dancers. The two married in 2000. Mr. Nunoo promptly sought lawful permanent resident status based on marrying a United States citizen. The United States Immigration and Naturalization Services denied him lawful permanent resident status in 2001 finding he offered no basis to support a finding of a bona fide marriage to citizen Dawn Nunoo. Mr. Nunoo tried again two years later. He attached tax document and affidavits and again swore to a bona fide marriage with Dawn Nunoo but concealed his relationship with another woman, Patience Lamptey, with whom he had a child weeks earlier. In a November 2005 interview with Immigration and Naturalization Services concerning his 2003 petition, Mr. Nunoo again failed to disclose the birth of his child in 2003 and a second child with Ms. Lamptey born in September 2005. The United States granted him lawful permanent resident status in December 2005 based on a bona fide marriage to Dawn Nunoo without knowing of his two children with Ms. Lamptey.

He then twice petitioned for naturalization in 2013 and 2016. The United States denied his naturalization application in 2017 finding he did not disclose his two children with Ms. Lamptey when it granted him lawful permanent resident status. He now petitions for our review of the denial of his 2016 naturalization petition. We conducted a bench trial two months ago where we admitted

exhibits and evaluated witness credibility. We find Mr. Nunoo willfully misrepresented material facts intending to obtain an immigration benefit in 2005. This material misrepresentation renders him ineligible to naturalize. We deny Mr. Nunoo's petition for review consistent with our findings of fact and conclusions of law.

# I.    Findings of Fact

1.      George Nunoo immigrated to the United States from Ghana in 1997.[1]

2.      Mr. Nunoo, a professional dancer, immigrated to the United States with a P-3 visa, designating him as an entertainer or performer.[2]

3.      Mr. Nunoo met United States citizen Dawn Nunoo (née Powell) after a dancing performance in 1999.[3]

4.      Mr. Nunoo married Dawn Nunoo in 2000.[4]

5.      Dawn Nunoo was twenty-seven years older than Mr. Nunoo when they married.[5]

### The United States denies Mr. Nunoo's first application for lawful permanent resident status in 2001.

6.      Dawn Nunoo petitioned for alien relative status in 2001 (an "I-130" petition) for the United States Immigration and Naturalization Services ("Services") to recognize Mr. Nunoo as her spouse.[6]

7.      Mr. Nunoo then applied to adjust his status to lawful permanent resident (an "I-485" petition) in 2001 based on Dawn Nunoo's I-130 petition.[7]

8.      Services denied the petitions in 2001. Services found Mr. Nunoo and Dawn Nunoo offered no documents or basis to show they shared a "bona fide marital relationship."[8]

9.      Mr. Nunoo understood why Services denied the petitions.[9]

10.     Mr. Nunoo had a son with Patience Lamptey in August 2003.[10]

### *Mr. Nunoo again applies for lawful permanent resident status in 2003.*

11.     The Nunoos waited until after the birth of Mr. Nunoo's child with Ms. Lamptey to try again to petition for lawful permanent resident status.

12.     Mr. Nunoo filed a second I-485 petition and Dawn Nunoo filed a second I-130 petition on or after September 30, 2003 through Mr. Nunoo's counsel Jill Nagy.[11]

13.     Unlike his 2001 petition, Mr. Nunoo submitted joint tax returns, joint bank accounts, evidence of cohabitation, and affidavits of third parties attesting to their marriage's legitimacy.[12]

14.     Services required Mr. Nunoo to "[l]ist your present husband/wife, all your sons and daughters (if you have none, write 'none.')" on the I-485 petition.[13]

15.     Mr. Nunoo did not list his child with Ms. Lamptey in the section of the I-485 petition requiring him to disclose his children.[14]

16.     Mr. Nunoo certified his answers to the I-485 petition as true under penalty of perjury.[15]

17.     Mr. Nunoo signed, but did not date, his I-485 petition.[16]

18.     Attorney Nagy signed and dated Mr. Nunoo's I-485 petition on September 30, 2003.[17]

19.     Dawn Nunoo signed and dated the I-130 petition submitted in connection with Mr. Nunoo's I-485 petition on September 30, 2003, the same date Attorney Nagy signed the I-485 petition.[18]

### *Mr. Nunoo denies children during a 2005 interview for lawful permanent resident status.*

20.     Services Officer Gwynne Dinolfo interviewed Mr. Nunoo and Dawn Nunoo together on November 22, 2005 in connection with their September 30, 2003 application for Mr. Nunoo's lawful permanent resident status.[19]

21.     Mr. Nunoo and Ms. Lamptey had a second child together on September 19, 2005.[20]

22.     Officer Dinolfo does not have specific recall of her November 22, 2005 interview of the Nunoos.[21]

23.     Officer Dinolfo interviewed applicants on behalf of the Services for nine years by the time she interviewed the Nunoos.[22]

24.     Officer Dinolfo followed her standard practice of notating the applications during interviews.[23] Officer Dinolfo notated the answers in red pen to the questions she asked applicants.[24]

25.     Officer Dinolfo followed a standard practice of asking applicants seeking lawful permanent resident status: "Do you have any children?"[25]

26.     Officer Dinolfo followed her standard practices during her interview of the Nunoos.[26]

27.     Officer Dinolfo asked Mr. Nunoo and Dawn Nunoo "if they had any children?"[27]

28.     Officer Dinolfo also asked Mr. Nunoo directly if he had children.[28]

29.     Mr. Nunoo told Officer Dinolfo he did not have children despite having two children with Ms. Lamptey.[29]

30.     Officer Dinolfo wrote "No children" in red ink on the I-485 petition in the section where Mr. Nunoo should have disclosed his child.[30]

31.     Officer Dinolfo sought to discover whether Mr. Nunoo had children regardless of the children's mother because—as Services's question on the I-485 petition suggests—Officer

Dinolfo needed to learn about "all" the applicant's "sons and daughters," including stepchildren and adopted children.[31]

32.     Services approved Mr. Nunoo's September 2003 I-485 petition on December 14, 2005, allowing him to become a lawful permanent resident of the United States. [32]

### *Mr. Nunoo's denials in November 2005 prevented Officer Dinolfo from investigating further.*

33.     Had Mr. Nunoo told Officer Dinolfo he had two children, Officer Dinolfo would have "investigated it further" by asking the children's age, name, birth certificates, and mother.[33]

34.     Officer Dinolfo would have investigated further because an applicant having children with someone besides their spouse "could be a fraud indicator" when a petitioner seeks lawful permanent resident status based on marriage.[34]

35.     Children outside of a marriage could show the petitioner's "marriage may not have been bona fide."[35]

### *The Nunoos divorce while Mr. Nunoo and Ms. Lamptey have more children.*

36.     The Nunoos separated in 2005 after their interview with Officer Dinolfo.[36] Dawn Nunoo had become ill and told Mr. Nunoo he should "find someplace to move."[37]

37.     Mr. Nunoo moved in with Ms. Lamptey (the mother of his two children) in 2007.[38]

38.     Mr. Nunoo and Ms. Lamptey had five children together by late 2012. [39]

39.     Mr. Nunoo and Dawn Nunoo divorced in October 2012.[40]

40.     Mr. Nunoo married Ms. Lamptey in December 2012.[41]

41.     Dawn Nunoo passed away in 2019.[42]

*Services denies Mr. Nunoo's naturalization applications.*

42.     Mr. Nunoo first applied for naturalization (an "N-400" application) in 2013.[43]

43.     Services denied Mr. Nunoo's first N-400 application in 2016.[44]

44.     Mr. Nunoo filed a second N-400 application to naturalize in March 2016.[45]

45.     Mr. Nunoo submitted an affidavit signed by his attorney supporting his second application.[46]

46.     Mr. Nunoo's attorney swore: "Mr. Nunoo, to the best of his knowledge, does not remember being interviewed in November 2005."[47]

47.     Mr. Nunoo's attorney referenced an earlier statement by Mr. Nunoo to Services where Mr. Nunoo stated Officer Dinolfo "never asked" him if he had children.[48] Mr. Nunoo's attorney characterized this statement as meaning "there was no question directed to [Mr. Nunoo] on November 22, 2005 as to whether or not he had any children."[49]

48.     Services denied Mr. Nunoo's second N-400 application.[50]

49.     Services reasoned Mr. Nunoo could not naturalize because he obtained his lawful permanent residence status unlawfully by willfully misrepresenting the material fact of his oldest child's existence in his 2003 I-485 petition and of his two children's existence during his November 22, 2005 interview with Officer Dinolfo.[51]

*We do not credit Mr. Nunoo's testimony he completed his 2003 I-485 petition before his child's birth.*

50.     Mr. Nunoo testified his former attorney Jill Nagy asked him to sign—but not to date—the 2003 I-485 petition on August 16, 2003.[52] Ms. Lamptey gave birth to Mr. Nunoo's first child on August 28, 2003.[53]

51.     Mr. Nunoo testified he did not disclose his first child with Ms. Lamptey on his 2003 I-485 petition because his first child with Ms. Lamptey had not been born when he answered questions on the petition even though he knew Ms. Lamptey expected a child in the next few weeks.[54]

52.     Mr. Nunoo claims Attorney Nagy never updated the 2003 I-485 petition before she dated it without his knowledge on September 30, 2003.[55]

53.     Mr. Nunoo's testimony on this several-week delay with this material change in his life is not credible.

54.     Dawn Nunoo submitted an I-130 petition in connection with Mr. Nunoo's 2003 I-485 petition.[56] Ms. Nunoo signed and dated her I-130 petition on September 30, 2003, the same date Attorney Nagy signed and dated Mr. Nunoo's 2003 I-485 petition.[57]

55.     Dawn Nunoo also did not disclose information about Mr. Nunoo's newborn child with Ms. Lamptey when asked to "List husband/wife and all children of your relative."[58]

56.     Dawn Nunoo indisputably completed this form after the birth of Mr. Nunoo's first child.

57.     Dawn Nunoo knew Mr. Nunoo had a child with Ms. Lamptey when she signed her I-130 petition.[59]

58.     The undisputed evidence confirms Dawn Nunoo and Mr. Nunoo coordinated their efforts to conceal Mr. Nunoo's child with Ms. Lamptey from the Services on September 30, 2003.

***We do not credit Mr. Nunoo's testimony regarding Officer Dinolfo's 2005 interview question.***

59.     Our lack of credibility finding is further evidenced by Mr. Nunoo's failure to correct any possible misunderstanding during his November 2005 interview with Officer Dinolfo.

60.     Officer Dinolfo asked Mr. Nunoo if he had children. He said no despite having a second undisclosed child with Ms. Lamptey by the November 22, 2005 interview.

61.     Mr. Nunoo's failure to correct the record when given the opportunity strongly suggests he intentionally misrepresented the existence of his first child on the 2003 I-485 petition. If Mr. Nunoo's omission on the 2003 I-485 petition constituted an honest mistake, he would have corrected the misrepresentation in his November 22, 2005 interview.

62.     Mr. Nunoo also testified regarding why he did not disclose his two children with Ms. Lamptey to Services during the November 22, 2005 interview.

63.     Mr. Nunoo testified Officer Dinolfo did not ask him if *he* had any children at the November 22, 2005 interview; rather, she asked only if he and Dawn Nunoo had children *together*.[60] He also testified Officer Dinolfo asked Dawn Nunoo if *she* had children, but not Mr. Nunoo if he alone had children.[61]

64.     Officer Dinolfo first testified she ordinarily asks spouses if "they" have children but then clarified she questioned the applicant.[62]

65.     Officer Dinolfo interviewed the Nunoos together on November 22, 2005.

66.     Mr. Nunoo's testimony as to his recall of the question in the 2005 interview is not credible given Officer Dinolfo's credible testimony concerning the need to ask about the applicant's children when evaluating a bona fide marriage.

67.     An applicant having children with another partner when seeking lawful permanent resident status based on a marriage to the non-parent fairly raises red flags for an investigating officer. We cannot find a basis to ignore the nature of Officer Dinolfo's obligations when evaluating a bona fide marriage.

68.     We are also mindful of Mr. Nunoo's recent recall at our December 2021 bench trial of specific facts and words when he could not recall specifics years ago. In the materials Mr. Nunoo submitted with his 2016 application for naturalization, he represented he did not remember the November 22, 2005 interview with Officer Dinolfo. But in December 2021, Mr. Nunoo  vividly remembered the November 22, 2005 interview and could now swear exactly how Officer Dinolfo phrased her question about his children. Mr. Nunoo testified reviewing the record of this case helped him jog his memory. We find this testimony suggesting reviewing this case's records over sixteen years after an interview could create such a vivid memory is not credible particularly when Mr. Nunoo previously remembered nothing about it.

69.     We cannot credit Mr. Nunoo's testimony Officer Dinolfo only specifically asked Dawn Nunoo if she had children. Officer Dinolfo's duties include asking applicants like Mr. Nunoo if *he* had any children because *he*—not citizen Dawn Nunoo—applied for lawful permanent resident status.

70.     Services, through the I-130 petition, asked Dawn Nunoo to disclose the children of Mr. Nunoo, not her own children. Officer Dinolfo credibly testified it was not her practice to ask the spouse of the applicant whether the spouse had children; it was instead her practice to ask the applicant about his/her children.[63] Mr. Nunoo's trial testimony regarding what Officer Dinolfo asked Dawn Nunoo impugns the credibility of his testimony regarding the November 22, 2005 interview.

71.     Mr. Nunoo also testified Officer Dinolfo only asked *one* question: "[Y]ou guys have children?"[64] We carefully questioned Mr. Nunoo to ensure he understood what he was saying.[65] Mr. Nunoo confirmed Officer Dinolfo asked the Nunoos jointly if they had children during the 2005 interview. But Officer Dinolfo did not ask only one question; she notated many

questions on the I-485 petition in red ink consistent with her standard practice, showing she asked many questions. And she credibly testified she asked Mr. Nunoo if he had children as she did in all interviews.

## II.    Conclusions of Law

1.      Mr. Nunoo misrepresented facts by failing to disclose his newborn child on his September 30, 2003 I-485 petition and by failing to disclose his two children during his November 22, 2005 interview.

2.      Mr. Nunoo willfully misrepresented the existence of his child in 2003 and his children in 2005.

3.      Mr. Nunoo's misrepresentations of having no children were material because he knew Services denied his earlier application for lawful resident status based on finding insufficient evidence of a bona fide marriage with Dawn Nunoo.

4.      Mr. Nunoo misrepresented material facts intending to obtain an immigration benefit.

## III.    Analysis

Congress allows noncitizens to "seek review" of a naturalization petition before us.[66] We review Services's denial de novo, making our own findings of fact and conclusions of law.[67] We do "not defer to any of [Services's] findings or conclusions in reviewing an application for naturalization."[68] Mr. Nunoo carries the burden "to show his eligibility for citizenship in every respect."[69] Mr. Nunoo must prove "by a preponderance of the evidence" he meets all of the requirements for naturalization.[70] We must resolve doubts regarding Mr. Nunoo's eligibility in the United States' favor.[71]

Mr. Nunoo is "eligible for naturalization" if he "[h]as been lawfully admitted as a permanent resident of the United States."[72] Mr. Nunoo must show he received lawful admission "in accordance with the immigration laws in effect" during his "initial entry."[73] "The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws."[74] A noncitizen "who has obtained lawful permanent resident status by fraud, or who was otherwise not entitled to it, has not been lawfully admitted."[75] As lawful admission is "a prerequisite to naturalization," Mr. Nunoo is "ineligible for naturalization" if he did not obtain his permanent resident status lawfully.[76]

A noncitizen is eligible to adjust his status to lawful permanent resident if he "is admissible to the United States."[77] A noncitizen is not admissible under 8 U.S.C. § 1182(a)(6)(C)(i) if he, "by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under" title VIII, Chapter 12 of the United States Code.[78] The section 1182 inquiry imposes four elements: Mr. Nunoo (1) misrepresented (2) willfully (3) a material fact (4) intending to obtain an immigration benefit.[79]

### 1. Mr. Nunoo misrepresented facts by failing to disclose his newborn child on his September 30, 2003 I-485 petition and by failing to disclose his two children during his November 22, 2005 interview.

Mr. Nunoo misrepresented the existence of his child with Ms. Lamptey when he completed his 2003 I-485 petition. Mr. Nunoo had his first child with Ms. Lamptey in mid-August 2003. He submitted his 2003 I-485 petition six weeks later on September 30, 2003 along with Dawn Nunoo's I-130 petition. Yet he did not disclose the existence of his first child in the section where Services prompted him to: "List your present husband/wife, all your sons and daughters (if you have none, write 'none.')." Mr. Nunoo simply listed Dawn Nunoo, but he did not disclose his newborn child

with Ms. Lamptey. Mr. Nunoo provided no credible testimony he misunderstood the question. Mr. Nunoo's testimony he completed the I-485 petition before his child's birth is not credible.

Mr. Nunoo again misrepresented the existence of his children during his November 22, 2005 interview with Officer Dinolfo. Officer Dinolfo asked Mr. Nunoo about "any children." By this time, Mr. Nunoo had two children with Ms. Lamptey. Mr. Nunoo understood the question but answered "no" despite having had two children with Ms. Lamptey. This prompted Officer Dinolfo to note "No children" on Mr. Nunoo's I-485 petition. Mr. Nunoo's testimony Officer Dinolfo did not ask him about his children is not credible.

### 2. Mr. Nunoo willfully misrepresented the existence of his child in 2003 and his children in 2005.

Willfulness generally requires "conscious wrong," "evil purpose," "or at least inexcusable carelessness."[80] A "'willful misrepresentation' requires, at the very least, knowledge of the falsity of the representation, much like fraud."[81]

We find Mr. Nunoo's misrepresentations willful because Mr. Nunoo knew he had a child when he completed the 2003 I-485 petition and knew he had two children when Officer Dinolfo interviewed him in 2005, yet he misrepresented these facts. Mr. Nunoo's testimony he completed the I-485 petition before his first child's birth lacks credibility. Mr. Nunoo's testimony Officer Dinolfo did not ask him about his children also lacks credibility.

Mr. Nunoo now argues he did not understand the question on the I-485 petition. But he did not testify he did not understand the question. His testimony shows he understood it.[82] We find Mr. Nunoo's misrepresentations willful.

12

### 3. Mr. Nunoo's misrepresentations of having no children were material because he knew Services denied his earlier application for lawful resident status based on finding insufficient evidence of a bona fide marriage with Dawn Nunoo.

We consider a misrepresentation to be material "when it tends to shut off a line of inquiry that is relevant to the alien's admissibility and that would predictably have disclosed other facts relevant to his eligibility for a visa, other documentation, or admission to the United States."[83] We measure materiality "according to the effect that the [misrepresented] fact would have had on the ultimate immigration decision had the truth been known."[84] Disclosure of the fact need not have changed Services's decision.[85] The standard, rather, is "whether further investigation into information concealed by [the noncitizen] '*might* well have resulted' in a refusal of [his] application."[86] A misrepresentation satisfies the materiality inquiry "if there is some reasonable possibility that the applicant would have been denied admissibility."[87]

A noncitizen, as here, may obtain lawful permanent resident status "by virtue of his marriage to a citizen of the United States."[88] Noncitizens seeking lawful permanent residency based on marriage to a United States citizen must show the marriage is bona fide.[89] "When evaluating whether a marriage was bona fide, the 'substantive question is whether, at the time of the marriage,'" the noncitizen intended to establish a life together with his spouse.[90]

We find Mr. Nunoo's misrepresentations regarding the existence of his children material. The misrepresentations shut off a relevant line of inquiry: the bona fides of Mr. Nunoo's marriage to Dawn Nunoo after Services denied his earlier petition on these grounds. Officer Dinolfo credibly testified Services considers out-of-wedlock children a "fraud indicator." Discovery of children with Ms. Lamptey would lead an experienced officer to ask the children's age, name, birth certificates, and mother. In turn, this information would lead an experienced officer to examine whether Mr. Nunoo lived with Dawn Nunoo and whether he and Ms. Lamptey romantically

engaged around the time of Mr. Nunoo's marriage to Dawn Nunoo, facts which directly bear on the bona fides of the marriage.

And Services "might well have" denied Mr. Nunoo's I-485 petition had he been truthful.[91] A person having children with someone other than his spouse is relevant to whether the person's marriage is bona fide. Mr. Nunoo had his first child with Ms. Lamptey only three years after he married Dawn Nunoo, suggesting he and Ms. Lamptey had a sexual relationship only about two years after Mr. Nunoo married Dawn Nunoo. We recognize the bona fides of marriage are determined based on intent at the time of the marriage. But Mr. Nunoo having children with Ms. Lamptey only a few years after he married Dawn Nunoo is at least relevant to Mr. Nunoo's intent at the time he married Dawn Nunoo. This inquiry is especially relevant considering Services denied Mr. Nunoo's first I-485 petition after finding his marriage not bona fide.

Mr. Nunoo did not adduce evidence showing he and Dawn Nunoo shared a marriage so bona fide it rendered his concealment of his children immaterial.[92] We recognize Mr. Nunoo submitted evidence of the kind our Court of Appeals evaluates when determining bona fide marriages, like joint tax returns, joint bank accounts, evidence of cohabitation, and affidavits of third parties attesting to the marriage's legitimacy.[93] But other evidence sheds significant doubt on Mr. Nunoo's intent to establish a life with Dawn Nunoo, such as the twenty-seven-year age gap separating the Nunoos,[94] the short period of time between when Mr. Nunoo met Dawn Nunoo and married Dawn Nunoo,[95] the Nunoos' separation only five years after their marriage,[96] and, most notably, Mr. Nunoo's children with Ms. Lamptey only three years after marrying Dawn Nunoo.

The Board of Immigration Appeals instructs evidence noncitizens have "other romantic partners, with whom they may have children" is a "significant consideration" when examining the bona fides of a marriage—"especially when these facts are either not disclosed or are deliberately

concealed."[97] We do not determine today whether Mr. Nunoo's marriage to Dawn Nunoo was *indeed* bona fide; we simply find investigating the undisclosed facts might have made Services deny Mr. Nunoo's application.[98] This alone makes the misrepresentations material. Mr. Nunoo conceded the materiality of his misrepresentations in his post-trial briefing.[99]

Despite his concession of materiality, Mr. Nunoo confusingly argues the information he misrepresented is not relevant to the bona fides of his marriage. He argues we cannot determine materiality because a Services representative other than Officer Dinolfo approved the application. The "other officer" is irrelevant; Mr. Nunoo still concealed his children to Services and affected Services's deliberations. Mr. Nunoo also references an anonymous tip letter not in evidence, arguing the letter had some effect on Officer Dinolfo.[100] But Mr. Nunoo previously moved to exclude the anonymous tip letter.[101] We granted the motion.[102] Mr. Nunoo then attempted to admit the letter at trial even though he had moved to exclude it.[103] Officer Dinolfo referenced the letter during her testimony, but we never heard evidence regarding what the letter said. We do not consider Mr. Nunoo's arguments regarding the letter's effect on the Services's decision.

### 4. Mr. Nunoo misrepresented material facts intending to obtain an immigration benefit.

We lastly examine whether Mr. Nunoo lied to procure an immigration benefit; namely, "a visa, other documentation, or admission into the United States."[104] We find Mr. Nunoo concealed his child in September 2003 and his children on November 22, 2005 to procure the benefit of lawful permanent residence based on a bona fide marriage. We cannot identify another reason why Mr. Nunoo lied. Mr. Nunoo knew Services denied his first I-485 petition because it found no bona fide marriage to Dawn Nunoo. Disclosure of a child and children to Services with another woman would arguably inform Services of more evidence against a bona fide marriage with Dawn Nunoo. This incentivized Mr. Nunoo to conceal information about his children with Ms. Lamptey lest

Services confirm the lack of bona fide marriage to Dawn Nunoo. Mr. Nunoo understood Services's questions yet provided untruthful answers. He did so to obtain lawful permanent resident status based on his theory of bona fide marriage to Dawn Nunoo while he failed to disclose children with Ms. Lamptey.

## IV.   Conclusion

We held a bench trial to evaluate the credibility of Mr. Nunoo and Services. We evaluated Mr. Nunoo's credibility and find his explanation for his failure to identify his child with Ms. Lamptey in his September 30, 2003 I-485 petition or identify his two children with Ms. Lamptey during the November 22, 2005 interview lacks credibility. We are not asked today whether Mr. Nunoo and Dawn Nunoo shared a bona fide marriage. We are only asked to take a fresh look at whether Services properly denied Mr. Nunoo's naturalization petition due to a material misrepresentation he had no children. We find Mr. Nunoo misrepresented material facts regarding his children. He did so to obtain an immigration benefit earlier denied when Services found he lacked a bona fide marriage. Mr. Nunoo's misrepresentation requires we deny his petition for review of Services's denial of his petition for naturalization.

---

[1] ECF Doc. No. 34, Notes of Testimony (N.T.), Dec. 16, 2021 Bench Trial at 7:14–18; 38:4–6.

[2] *Id.* at 16:1–6; 101:2–15.

[3] *Id.* at 16:1–12; 38:7–11; Ex. 15 at 4 (Dawn's maiden name is "Powell").

[4] N.T. at 9:18–20; 38:9–11.

[5] *See* Ex. 1 at Part B.4; Part C.4.

[6] N.T. at 38:14–22; Ex. 1 (Ms. Nunoo's I-130).

[7] N.T. at 38:12–39:20; Ex. 2 (Mr. Nunoo's I-485).

[8] Ex. 3 at "Nunoo 21."

16

[9] N.T. at 42:4–14; 17–20.

[10] *Id.* at 43:24–44:4; 68:3–10.

[11] *Id.* at 42:21–43:4; 66:19–23; *see* Exs. 5–6.

[12] *See* Ex. 15.

[13] Ex. 6 at Part 3.B.

[14] *Id.*

[15] N.T. at 48:6–21; Ex. 6 at Part 4.

[16] N.T. at 49:9–10; Ex. 6 at Part 4.

[17] Ex. 6 at Part 5.

[18] Ex. 4 at Part E.

[19] *See* Ex. 5 (identifying date of interview).

[20] *See* Ex. 12 at Part 10.B.1 (on later naturalization application, disclosing second child born in September 2005); N.T. 68:3–10.

[21] N.T. at 99:3–6.

[22] *Id.* at 97:17–21.

[23] *Id.* at 100:2–9; 100:18–20.

[24] *Id.* at 100:1–9.

[25] *Id.* at 105:8–12.

[26] *Id.* at 100:18–19.

[27] *Id.* at 105:16–17.

[28] *Id.* at 106:2–5; 105:18–19 (clarifying Officer Dinolfo asked the applicant about children).

[29] *Id.* at 105:10–106:9; Ex. 6 at Part 3.B (notation reading "No children").

[30] Ex. 6; N.T. at 105:10–15.

[31] N.T. at 106:18–107:13.

[32] Ex. 6 at 1.

[33] N.T. at 106:10–17.

[34] *Id.* at 107:3–7; 107:16–22.

[35] *Id.* at 107:23–108:3.

[36] *Id.* at 10:14–15; 34:15–24.

[37] *Id.* at 35:15–19.

[38] *Id.* at 73:10–11.

[39] Ex. 12 at Part 10.

[40] N.T. at 9:24–10:5.

[41] *See* Ex. 12 at Part 9.4.E.

[42] N.T. at 69:17–24.

[43] Ex. 7.

[44] *Id.*; N.T. at 72:19–20.

[45] Ex. 12.

[46] *See* Ex. 8.

[47] *Id.* at 2.

[48] *Id.* at 2–3.

[49] *Id.* at 3.

[50] Ex. 12 at 1.

[51] *See* Ex. 11 at 3.

[52] N.T. at 32:10–21; 47:16–24.

[53] *Id.* at 47:16–24.

[54] *Id.* at 14:20–24; 32:10–21; 47:7–48:4; 56:15–20.

[55] *See* Ex. 6 at Part 5.

[56] *See* Ex. 4.

[57] *Id.* at Part E.

[58] *Id.* at Part C.

[59] N.T. at 51:2–7.

[60] *Id.* at 54:17–21.

[61] *Id.* at 31:22–32:6.

[62] *Id.* at 105:7–19.

[63] *Id.* at 116:17–20.

[64] *Id.* at 91:4–6.

[65] *Id.* at 91:10–19.

[66] 8 U.S.C. § 1421(c).

[67] *Id.*

[68] *Ampe v. Johnson*, 157 F. Supp. 3d 1, 7 (D.D.C. 2016).

[69] *Koszelnik v. Sec'y of Dep't of Homeland Sec.*, 828 F.3d 175, 179 (3d Cir. 2016) (quoting *Berenyi v. Dist. Dir., Immigr. & Naturalization Serv.*, 385 U.S. 630, 637 (1967)).

[70] *Saliba v. Att'y Gen. of United States*, 828 F.3d 182, 189 (3d Cir. 2016) (quoting 8 C.F.R. § 316.2(b)).

[71] *Id.*

[72] 8 C.F.R. § 316.2(a)(2).

[73] 8 C.F.R. § 316.2(b); *see also* 8 U.S.C. § 1429.

[74] *Koszelnik*, 828 F.3d at 179 (quoting 8 U.S.C. § 1101(a)(20)).

[75] *Id.* at 180.

[76] *Saliba*, 828 F.3d at 191–92; *see also* 8 U.S.C. § 1429.

[77] 8 U.S.C. § 1255(a); *see also Saliba*, 828 F.3d at 190.

[78] 8 U.S.C. § 1182(a)(6)(C)(i).

[79] *See Ampe*, 157 F. Supp. 3d at 11 (describing "three conditions" for violating section 1182 in addition to the misrepresentation).

[80] *Id.* (citing *Willful*, Black's Law Dictionary (10th ed. 2014)).

[81] *Id.*

[82] *See, e.g.*, N.T. at 47:18–24 (Mr. Nunoo explaining his discussion with Attorney Nagy about how to answer the I-130 question); 57:6–11 (explaining what "none" means).

[83] *Matter of D-R-*, 27 I. & N. Dec. 105, 105 (BIA 2017); *see also Mwongera v. I.N.S.*, 187 F.3d 323, 330 (3d Cir. 1999) (a misrepresentation is material if it "tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded" (quoting *Matter of Kai Hing Hui*, 15 I. & N. Dec. 288, 289 (BIA 1975)).

[84] *Marko v. Barr*, No. 18-11089, 2019 WL 5578103, at *4 (E.D. Mich. Oct. 29, 2019).

[85] *Gozun v. Att'y Gen. of U.S.*, 375 F. App'x 276, 279 (3d Cir. 2010) ("The relevant inquiry is not whether officials necessarily would have denied [the] visa application had they known the truth.").

[86] *Id.* (emphasis in original) (quoting *Matter of Ng*, 17 I. & N. Dec. 536, 537 (BIA 1980)).

[87] *Ampe*, 157 F. Supp. 3d at 18.

[88] *Gallimore v. Att'y Gen. of U.S.*, 619 F.3d 216, 221–22 (3d Cir. 2010).

[89] *See, e.g.*, *Ampe*, 157 F. Supp. 3d at 18; *Dos Reis v. McCleary*, 200 F. Supp. 3d 291, 298 (D. Mass. 2016).

[90] *Dos Reis*, 200 F. Supp. 3d at 298 (emphasis added) (quoting *Rodriguez v. INS*, 204 F.3d 25, 27 (1st Cir. 2000)); *see also McKenzie-Francisco v. Holder*, 662 F.3d 584, 587 (1st Cir. 2011) (a marriage is bona fide if, "at the time that the newlyweds plighted their troth, [the noncitizen] to establish a life with his spouse").

[91] *Gozun*, 375 F. App'x at 279.

[92] *See, e.g.*, *Ampe*, 157 F. Supp. 3d at 18 (petitioner could have made an "unrefuted showing" of a bona fide marriage to render a misrepresentation immaterial).

[93] *See Doe v. Att'y Gen. of U.S.*, 383 F. App'x 214, 218–19 (3d Cir. 2010) ("[M]aterials which may demonstrate that a marriage is *bona fide* include: (1) documentation showing joint ownership of property; (2) a lease showing joint tenancy of a common residence; (3) evidence of commingling of financial resources; (4) birth certificates of children born to the petitioner and beneficiary; (5) affidavits of third parties having knowledge of the *bona fides* of the marital relationship; and (6) any other documentation which is relevant to establish that the marriage was not entered into in order to evade the immigration laws of the United States." (citing 8 C.F.R. § 204(a)(1)(i)(B)).

[94] *Naiker v. United States Citizenship & Immigr. Servs.*, 352 F. Supp. 3d 1067, 1074 (W.D. Wash. 2018) ("age gap" between spouses can support inference of marriage fraud); *Ober-Galos v. Napolitano*, No. 12-02902, 2015 WL 394626, at *3 (N.D. Cal. Jan. 29, 2015) (same).

[95] *Wen Yuan Chan v. Lynch*, 843 F.3d 539, 545 (1st Cir. 2016) (two-month courtship before marriage supported inference marriage was a sham).

[96] *Gaur v. Gonzalez*, 124 F. App'x 738, 742 (3d Cir. 2005) (post-marriage separation relevant to ascertaining bona fides of marriage).

[97] *Matter of P. Singh*, 27 I. & N. Dec. 598, 609 (BIA 2019).

[98] *See, e.g.*, *Gozun*, 375 F. App'x at 279 (noncitizen's misrepresentations included in a falsified birth certificate material because they shut off a line of inquiry into "the true details of her family history and personal circumstances").

[99] *See* ECF Doc. No. 41 at 6 ¶ 34 ("Neither party disputes that [the I-485 question about children] is material. The existence of children outside of the marriage can raise a question that a marriage is not bona fide. [Officer] Dinolfo indicated that she would have asked follow up questions or looked at the application harder if she realized that Mr. Nunoo had children with another woman.").

[100] *See, e.g.*, ECF No. 41 at 10–11.

[101] ECF Doc. No. 25.

[102] ECF Doc. No. 31.

[103] *See* N.T. at 125:21–128:17.

[104] 8 U.S.C. § 1182(a)(6)(C)(i).